UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CATHERINE OKORO,

    Plaintiff,

    v.                                        Case No. 11-C-267

PYRAMID 4 AEGIS and
JEROME BATTLES,

    Defendants.

---

**DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

### I. PROCEDURAL BACKGROUND

On March 16, 2011, the plaintiff, Catherine Okoro ("Okoro"), filed a complaint naming Pyramid 4 Aegis ("Aegis") and Jerome Battles ("Battles") as the defendants. She seeks unpaid minimum wages, liquidated damages, interest, and attorney fees under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201. *et seq.*, as well as damages for breach of contract (consisting of $2,000.00 per month for the period of time that she worked for the defendants). In their answer to the plaintiff's complaint the defendants assert a counterclaim for interference with contract.

On February 17, 2012, Okoro filed a motion for summary judgment seeking an order from the court in favor of her FLSA claim and dismissing the defendants' counterclaim. In their response brief (filed on March 16, 2012), the defendants assert that they do not object to the court's dismissing their counterclaim. However, they oppose Okoro's motion for summary judgment on her FLSA claim. On March 30, 2012, Okoro filed her reply brief. Thus, the plaintiff's motion for summary judgment is fully briefed and is ready for resolution. For the reasons that follow, the plaintiff's motion for summary judgment will be granted.

## II. FACTUAL BACKGROUND

Accompanying the plaintiff's motion was a set of proposed findings of fact to which the defendants responded. A review of those documents demonstrates the following.

At all relevant times Battles has been the sole owner of Aegis, which is a for-profit company. Okoro and Battles met in approximately 2008. At that time, Okoro sold worker's compensation insurance to Battles.

According to Okoro, she agreed to work for Battles to help him get his business started. According to Battles, Okoro only agreed to work for Battles if he would have a relationship with her.

Okoro attended five Community Based Residential Training sessions. Two of these sessions she attended with Battles. According to Battles, Okoro attended these sessions to learn the business for her own benefit and he never asked her to attend the sessions.

Beginning on June 7, 2009, Okoro began performing work for Battles and Aegis. According to Battles, the work that Okoro may have performed was done on a voluntary basis, without any expectation of being paid. According to Battles, Okoro never asked to be paid and Okoro knew that there was no money with which to pay her.

Each day that Okoro worked, she noted the time that she started work and the time that she stopped working. Okoro also kept track of the total hours that she worked and recorded all of this time on a time sheet that she created for the business. According to Battles, he never saw a time sheet until this litigation started. He neither approved nor signed any time sheet submitted by Okoro. Furthermore, according to Battles, Okoro never submitted either her time sheet or hours of work to Paychex for payment.

According to Okoro, during the summer and early fall of 2011, her work primarily focused on getting the business ready to accept clients. According to Battles, any actual work done by Okoro was voluntary and was not requested by Battles.

According to Okoro, during this time period she worked five hours per day, at least five days per week, and often on Saturdays as well. According to Battles, Okoro worked no regular hours and no regular days. Furthermore, according to Battles, Okoro was a full time insurance salesperson and much of the time spent at the business was in a social relationship with Battles.

According to Okoro, she initially spent a significant amount of time cleaning the facility and purchasing necessary items for the facility. According to Battles, Okoro spent very little time cleaning the facility and only purchased small items.

According to Okoro, during this time she spent significant time researching the many regulations for a residential care facility to ensure that Aegis would be approved to accept a client. According to Battles, Aegis was approved to accept clients prior to Okoro appearing at the business.

According to Okoro, she also spent time putting processes in place for the smooth running of the business. For example, she began drafting job descriptions, setting up Paychex for payroll processing, and hiring the accountant for the business. According to Battles, all job descriptions in community based residential facilities ("CBRF") are set by the State of Wisconsin; Okoro did not have to draft the job descriptions; Okoro may have contacted Paychex to handle the payroll, but Okoro did not hire an accountant for the business.

According to Okoro, marketing was also an important part of her job. Efforts she took to market Aegis included: creating a flyer about Aegis; sending the flyer and other information about the group home to agencies that might refer clients to Aegis; driving to nursing homes, mental health facilities and placement agencies to solicit for clients; organizing and attending open houses held at

3

the facility; connecting Aegis with referral networks; and, making solicitation calls on behalf of the group home.

According to Battles, Okoro did modify a flyer that was originally drafted by Adrian Wade; Okoro did send out the flyer to solicit business, but Battles told her not to do so; Battles and Okoro did walk to some nursing homes but it was often after a date or going out to eat; Okoro did organize and attend at least one open house; Battles does not know what Okoro is referring to when she claims that she connected Aegis with referral networks; and Okoro did make some phone calls on behalf of the business, however, she did so on her own volition.

According to Okoro, in November 2009, the first client came to stay at the facility; Battles cannot recall when the first client came to the facility.

According to Okoro, once the facility started accepting clients, she increased the hours that she worked. Starting on November 2, 2009, she began working seven hours per day for five days per week, and rarely on the weekends. According to Battles, Okoro never worked seven hours per day for five days per week; Okoro had a full time job as an insurance agent and she had an office on 93rd and Capitol Drive.

According to Okoro, once the first client came to stay, it was necessary to hire staff to provide care; she was responsible for interviewing and hiring employees. According to Battles, Okoro interviewed caregivers but Battles did the hiring.

According to Okoro, she assumed additional responsibilities with the employees. She was responsible for employee supervision; creating the work schedule for employees; presiding over employee meetings; confirming hours worked by various employees; submitting the hours to Paychex for the employees to receive their paychecks; filling in for employees who did not show up for work; issuing discipline; and, responding to requests for information from the Unemployment Division.

4

Battles admits that Okoro may have checked on caregivers in limited situations; states that both Okoro and Battles made out work schedules; states that Okoro may have had employee meetings once or twice on her own volition, and that these meetings consisted of conversations with employees; states that both he and Okoro confirmed work hours; admits that Okoro submitted the hours to Paychex for the employees to receive their paychecks; states that Okoro could not fill in for employees as she was neither certified as a caregiver nor as an administrator; states that Okoro only issued discipline on one or two occasions, and then she was harsh with one or two of the employees and Battles had to talk to her about that; and, states that Okoro did respond to the Unemployment Division on a few occasions.

According to Okoro, with the clients she had additional responsibilities, which included the following: her being the primary contact with case managers; her being the primary contact with doctors; her being the primary contact with families and employers of clients in the facility; her picking up clients from jobs and bringing them to doctors' appointments; her being the primary contact with pharmacies and health care agencies for client prescriptions; her picking up client prescriptions that were not otherwise delivered; and, her shopping for groceries necessary for the clients.

According to Battles, Okoro would go back to her own insurance office and call a case worker on occasion; he does not know if she was the primary contact with doctors (caregivers are to contact doctors if necessary); with regard to contacting families, Battles was the primary contact, the caregivers were the secondary contact and Okoro may have called the families on occasion; Okoro rarely, if ever, transported a client because the business contracted with a transportation service; Adrian Wade contacted pharmacies, Battles contacted the pharmacies, and Okoro shared that responsibility; Okoro shared with Adrian Wade and Battles the responsibility of picking up client

5

prescriptions that were not otherwise delivered; and, Okoro may have stopped for a few groceries on occasion.

According to Okoro, she acted as a representative for the group home. In this capacity, she represented Aegis in court for a client who was detained. She also represented Aegis for client reviews and awards at their jobs. She was also contacted by an attorney on behalf of one of Aegis's clients. According to Battles, he is unaware of these facts.

According to Okoro, she continued to perform work for Aegis through May 18, 2010. According to Battles, Okoro stopped appearing at Battles's group home on or about May 18, 2010.

According to Okoro, she has never been paid for any of the work that she did for Aegis. Battles admits this, but asserts that she never asked for pay, never submitted time sheets to either Battles or Paychex, and was specifically told that there was no money with which to pay her.

Okoro asserts that she is a single mother of four teenage children; that she is solely responsible for the financial support of her family; and, that at all times she believed that her work for Aegis would eventually be compensated. According to Battles, Okoro had a full time job working for Farmers Insurance Company and she was specifically told that she would not be compensated for any work done at the time when the community based residential facility was operating in the red.

### III. SUMMARY JUDGMENT STANDARD

A district court shall grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

6
Case 2:11-cv-00267-WEC   Filed 04/23/12   Page 6 of 18   Document 42

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). However, a mere scintilla of evidence in support of the nonmovant's position is insufficient. *See Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255). "'[I]n the light most favorable' . . . 'simply means that summary judgment is not appropriate if the court must make a choice of inferences.'" *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003) (quoting *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997)).

### IV. DISCUSSION

First of all, the defendants have abandoned their counterclaim for tortious interference with contract and do not oppose the court's granting summary judgment dismissing such counterclaim.

Thus, the plaintiff's motion to dismiss the defendants' counterclaim will be granted. This then gets us to the plaintiff's motion for summary judgment on her FLSA claim.[1]

The plaintiff claims that she is entitled to be compensated under the FLSA for the work that she performed for Aegis. She also claims that Aegis and Battles are jointly liable to her for such compensation. For their part, the defendants argue that any work performed by Okoro was voluntary and performed without any expectation of monetary compensation. Thus, they argue that any work she may have performed does not fall under the provisions of the FLSA.

Congress enacted the FLSA to eliminate "in industries engaged in commerce or in the production of goods for commerce, . . . labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers" because such conditions "(1) cause[] commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States;(2) burden[] commerce and the free flow of goods in commerce; (3) constitute[] an unfair method of competition in commerce; (4) lead[] to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interfere[] with the orderly and fair marketing of goods in commerce." 29 U.S.C. § 202(a). In general, work constitutes employment when there is an expectation of in-kind benefits in exchange for services. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985).

The minimum wage provisions of the FLSA apply only to workers who are "employees" within the meaning of the Act. 29 U.S.C. § 206(a)(1). Under the FLSA, an "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" includes "any

---

[1] The court assumes that the plaintiff's motion is only on the issue of liability, leaving the issue of damages to be addressed in future proceedings.

person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). To "employ" is defined as to "suffer or permit to work." 29 U.S.C. § 203(g). For purposes of social welfare legislation, such as the FLSA, "'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987) (quoting *Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297, 299 (5th Cir. 1975)). A court is required to look past the "technical concepts" of employment and determine if the "economic reality" is such that an individual would be deemed an employee for purposes of the FLSA. *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). To assess the "economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity." *Lauritzen*, 835 F.2d at 1534 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). The determination of an individual's employment status is a legal rather than a factual determination. *Karr v. Strong Detective Agency, Inc.*, 787 F.2d 1205, 1206 (7th Cir. 1986).

When determining whether a worker is an employee under the FLSA, the court is required to apply a "six-factor test to determine the 'economic reality' of the situation." *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 565 (7th Cir. 2009) (citing *Lauritzen*, 835 F.2d at 1534). The six factors are as follows: (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon her managerial skill; (3) the alleged employee's investment in equipment or materials required for her task, or her employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business. *Lauritzen*, 835 F.2d at 1534-35. Each of the criteria "must be applied with

9

[the] ultimate notion in mind" that "*dependence . . .* indicates employee status." *Id*. at 1538 (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976)).

However, this six-factor test is of limited assistance in this present case. This test is generally utilized in deciding the question of whether a worker is an employee or an independent contractor. But, here, the question is not whether Okoro was an employee or an independent contractor. The relevant question is whether Okoro was an employee or a volunteer.

The Supreme Court has defined a volunteer as "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit.'" *Alamo Found.*, 471 U.S. at 295 (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Since the *Alamo* decision, the Department of Labor has promulgated regulations defining the term "volunteer," at least as such term applies to those volunteering their services for units of state and local government.

> (a) An individual who performs hours of service for a public agency for civic, charitable, or humanitarian reasons, without promise, expectation or receipt of compensation for services rendered, is considered to be a volunteer during such hours. Individuals performing hours of service for such a public agency will be considered volunteers for the time so spent and not subject to sections 6, 7, and 11 of the FLSA when such hours of service are performed in accord with sections 3(e)(4)(A) and (B) of the FLSA and the guidelines in this subpart.
>
> (b) Congress did not intend to discourage or impede volunteer activities undertaken for civic, charitable, or humanitarian purposes, but expressed its wish to prevent any manipulation or abuse of minimum wage or overtime requirements through coercion or undue pressure upon individuals to "volunteer" their services.
>
> (c) Individuals shall be considered volunteers only where their services are offered freely and without pressure or coercion, direct or implied, from an employer.
>
> (d) An individual shall not be considered a volunteer if the individual is otherwise employed by the same public agency to perform the same type of services as those for which the individual proposes to volunteer.

10

29 C.F.R. § 553.101. "The question of whether an individual is a volunteer is a matter of law to be determined by the court." *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011).

In this regard, Okoro argues that, under the FLSA, employees may not volunteer services to for-profit employers. More precisely, she argues as follows:

> In fact, the exemption for volunteers applies only when the work performed is *solely* for the benefit of (alleged) volunteer - as it would be if the person were going to school. Only in this limited circumstance can a person be treated as an unpaid "volunteer." http://www.dol.gov/whd/regs/compliance/whdfs71.htm. In fact, not even employees' own protestations that they were volunteers are dispositive. *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 301 (1985).
>
> . . . .
>
> . . . Mr. Battles further admits that Pyramid 4 Aegis is a for-profit business. This fact is a clear distinction from those cases cited by Defendants. The few cases cited by Defendants with a finding that the plaintiff was a volunteer all involved either public sector employers (*Rodriguez v. Township of Holiday Lakes*; *Benshoff v. City of Virginia Beach*; and *Todaro v. Township of Union*) or non-profit organizations (*Turner v. Unification Church*). Additionally, whether Defendants actually make a large profit . . . is beside-the-point. The business is meant to generate a profit, and thus cannot engage unpaid volunteers. *See* http://www.dol.gov/elaws/esa/flsa/docs/volunteers.asp.
>
> In DOL Opinion Letter FLSA2002-9 (Oct. 2, 2002), the Department of Labor explained why the exemption for volunteers rarely if ever applies in the context of for-profit enterprises. Among other reasons, employers who engage unpaid "volunteers" gain an unfair competitive advantage from the payment of substandard wages, or as here, no wages at all. *See Alamo Foundation*, 471 U.S. at 299; *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945). As the Supreme Court explained in *Alamo Foundation*, "if an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,' employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act. Such exceptions to coverage would affect many more people than those workers directly at issue in this case and would be likely to exert a general downward pressure on wages in competing businesses." 471 U.S. at 302.
>
> Likewise here, as a for-profit business, Defendants secured an economic benefit from Ms. Okoro's work. She solicited clients, prepared the facility, interviewed staff, submitted payroll, purchased items for the business, supervised staff, created work schedules, confirmed employee hours, picked up medication and performed other tasks -- all work Mr. Battles admits Ms. Okoro performed for

> Pyramid 4 Aegis. By contrast, Defendants have failed to identify any personal benefit that Ms. Okoro purportedly received from her work for this for-profit business.
>
> Thus, the record does not support a finding that Ms. Okoro worked "solely for h[er] personal purpose or pleasure." *Walling*, 330 U.S. at 152. To the contrary, the undisputed facts reflect that Defendants did suffer or permit Ms. Okoro to work as defined expansively in the FLSA. 29 U.S.C. § 203(g). Consequently, Defendants were required to pay Ms. Okoro at least the minimum wage for all her hours worked. 29 U.S.C. § 207.

(Pl.'s Reply 4-6) (internal citation and footnote omitted).

Of course, in *Alamo Foundation*, the entity for which persons were performing "volunteer" work was not a for-profit enterprise, like Aegis is. This court has been unable to find any regulations addressing the circumstances under which a person can "volunteer" for a for-profit entity and have his work not fall under the provisions of the FLSA. Indeed, that the court has been unable to find such regulations would no doubt be touted by the plaintiff as support for her argument that one <u>cannot</u> under any circumstances volunteer for any for-profit entity under the FLSA.

But, to say that one cannot under any circumstances volunteer for a for-profit entity might be too sweeping a statement. After all, in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), the defendant railroad was a for-profit entity. The Supreme Court nevertheless found that the prospective yard brakemen who were receiving training from the railroad without any monetary compensation were not employees with the meaning of the FLSA.

> The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage. The definitions of "employ" and of "employee" are broad enough to accomplish this. But, broad as they are, they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction. Had these trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of the Act. Nor could they, in that situation, have been considered as employees of the railroad merely because the school's graduates would constitute a labor pool from which the railroad could later draw its employees. The Fair Labor Standards Act was not intended to penalize railroads for providing, free of charge, the

12

> same kind of instruction at a place and in a manner which would most greatly benefit the trainees.
>
> Accepting the unchallenged findings here that the railroads receive no "immediate advantage" from any work done by the trainees, we hold that they are not employees with the Act's meaning. We have not ignored the argument that such a holding may open up a way for evasion of the law. But there are neither findings nor charges here that these arrangements were either conceived or carried out in such a way as to violate either the letter or the spirit of the minimum wage law. We therefore have no case before us in which an employer has evasively accepted the services of beginners at pay less than the legal minimum without having obtained permits from the administrator. It will be time enough to pass upon such evasions when it is contended that they have occurred.

*Id.* at 152-53. With this in mind, it becomes necessary to consider more than just whether the defendant is a for-profit entity.

In determining whether someone is an employer or a volunteer, this court has not stumbled upon any factored test similar to that of the 6-factor economic realities test used to differentiate independent contractors and employees. Rather, the court finds that the test for employment is governed by a reasonableness standard that takes into account the totality of the circumstances. The court is to review "'the objective facts surrounding the services performed to determine whether the totality of the circumstances' establish volunteer status, . . . or whether, instead, the facts and circumstances, objectively viewed, are rationally indicative of employee status." *Purdham*, 637 F.3d at 428 (quoting *Cleveland v. City of Elmendorf*, 388 F.3d 522, 528 (5th Cir. 2004)). In addition to the "economic reality" of the situation, other factors to consider include whether there was an expectation or contemplation of compensation, whether the employer received an immediate advantage from any work done by the individual, the relationship of the parties, and the goals of the FLSA. *See Alamo Found.*, 471 U.S. at 300-01; *Rutherford Ford Corp. v. McComb*, 331 U.S. 722, 730 (1947) (stating that the employer-employee relationship "does not depend on such isolated factors but rather upon the circumstances of the whole activity"); *Lauritzen*, 835 F.2d at 1534-35).

13

It is the examination of objective indicia and the application of common sense with which this court arrives at its determination of whether the plaintiff here is an employee for purposes of the FLSA.

According to Okoro, she never agreed to volunteer for Aegis; at all times, she expected to be compensated for her work. Specifically, Okoro expected to be paid $2,000 per month for her work, and in agreeing to defer her compensation until the facility garnered clients, she still worked with the expectation that she would be paid. (Okoro Aff. ¶¶ 4, 7-9.) Battles, while arguing that Okoro was a volunteer, also states that he intended to pay Okoro for her work if she qualified as an administrator and if the business had enough money in the future. (Battles Aff. ¶¶ 6, 25.) The court notes Battles's expectation not for the purpose of weighing the parties' competing assertions (for this would surely contradict the FLSA's remedial purpose) but to merely highlight that he too contemplated a compensation mechanism for Okoro's work.

Expectations aside, it is not entirely correct for the plaintiff to assert that the defendants have failed to identify any personal benefit that Okoro purportedly received from her work for Aegis. In his affidavit, Battles avers that when Okoro sold him worker's compensation insurance for Aegis, she told him "that she wanted to learn the group home business and therefore, she would learn the business by working at Pyramid 4 Aegis for no compensation." (Battles Aff. ¶ 5.)

This court is not unmindful of any claim that Okoro may have wanted to learn and indeed did learn about the CBRF business. That may certainly have been part of her motivation in providing Battles some assistance in his effort to build the business. However, Battles does not deny that the work Okoro performed on behalf of Aegis conferred an immediate benefit to the company. Thus, the facts in this case stand in stark contrast to those in *Walling*. In *Walling*, the lower court's finding that "the railroads receive[d] no 'immediate advantage' from any work done by the trainees" was unchallenged. 330 U.S. 148, 153. Indeed, "the applicant's work [did] not expedite the company

14

business, but . . . sometimes [did] actually impede and retard it." *Id*. at 150. In other words, the railroad was not receiving any immediate benefit from the training that was being given to the prospective brakemen.

Not so in the case at bar. The evidence here does not demonstrate that the work performed by Okoro on behalf of Aegis interfered in any way with the business of Aegis. To the contrary, the nature of the work that she performed, such as cleaning, picking up prescriptions, appearing in court on behalf of clients at the facility, and calling in hours for caregivers to Paychex, was undeniably of substantial assistance to Aegis. Even more to the point, such work was not akin to the "course of practical training," which the prospective yard brakemen in *Walling* received. *Id.* at 150. One hardly needs to be trained in how to clean a facility, how to pick up prescriptions, and how to call in hours for caregivers.

Additionally, the economic reality of the situation was that Okoro worked for Aegis for a substantial length of time. The length of the "training course" that the prospective brakemen received in *Walling* was seven or eight days. *Id.* at 149. By contrast, Okoro worked for Aegis over the course of almost one year.

To be sure, Okoro and Battles had a "personal relationship" over the course of the relevant time period. (Okoro Aff. ¶ 6.) While it may be that at least some of the time Okoro spent at Aegis was to socialize with Battles, that particular matter may speak to the amount of damages to which she is entitled; after all, socialization may not be the equivalent of work. For purposes of Okoro's motion, it is sufficient to find that, despite her relationship with Battles, she still performed substantial work for Aegis, Aegis reaped a direct and immediate benefit from her work, and she had a reasonable expectation that she would be compensated for her work. In sum, taking into account

15

the totality of the circumstances in this case leads me to conclude that Okoro performed work for Aegis as an employee and not as a volunteer.

Finally, it must not be forgotten that, by design, the FLSA's purpose is "remedial and humanitarian." *Tenn. Coal, Iron & R.R. Co. v. Muscodoa Local No. 123*, 321 U.S. 590, 597 (1944), *superseded by statute*, Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 86 (1947) (codified as amended at 29 U.S.C. § 254). To effectuate this purpose, the FLSA requires courts to interpret its application broadly. *See id.* With this in mind, allowing Aegis the benefit of Okoro's free labor when there existed an expectation of compensation would not comport with the FLSA's purpose.

Thus, to the extent that the plaintiff's motion seeks a determination that she worked for Aegis and is therefore entitled to compensation for such work under the FLSA, her motion will be granted. Precisely how much work she performed for Aegis, and for how many hours she should be compensated by Aegis, are matters for trial. It is enough to say that the work she performed for Aegis, at least for purposes of the FLSA, was not as a volunteer, but rather as an employee.

There is one final matter to address. The plaintiff's motion seeks a finding that the defendants are jointly liable for any compensation due to her under the FLSA. She argues as follows:

> The FLSA's definition of "employer" is extremely broad and includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Consequently, it is black letter law that an individual owner or officer of a corporation may be liable under the FLSA where that individual is responsible for the violation. *See Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir. 1983) ("The overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages[.]"); *Solis v. Saraph[i]no's, Inc.*, 2011 U.S. Dist. LEXIS 43904, *9-12 (E.D. Wis. Apr. 22, 2011).
>
> Here, the Amended Answer admits that Defendant Battles owns Pyramid 4 Aegis, "was primarily in control over operations and wages for Pyramid 4 Aegis," and "supervised Plaintiff's . . . work." (PFF ¶ 12) These admissions establish Defendant Battles' liability as a joint employer under the FLSA. 29 U.S.C. § 203(d); *Agnew*, 712 F.2d at 1514; *Saraph[i]no's*, 2011 U.S. Dist. LEXIS 43904 at *9-12.

16

> Accordingly, Plaintiff is also entitled to summary judgment on the issue of the joint employer liability of Defendant Battles and Pyramid 4 Aegis on the FLSA claims.

(Pl.'s Br. 6-7.)

To be sure, Battles admits that he is the sole owner of Aegis. And the FLSA does impose liability as an "employer" on "any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). Furthermore, Battles has offered no argument in opposition to the plaintiff's joint employer liability argument.

As noted by the plaintiff, in *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983), the court stated that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Id.* at 1514. More recently, another branch of this court applied the above holding of *Donovan* in finding an owner and president of the corporate defendant jointly and severally liable along with the corporation precisely because "he exercised control over the employees with regard to employment and pay practices." *Solis v. Saraphino's, Inc.*, No. 09-CV-954, 2011 U.S. Dist. LEXIS 43904, at *10 (E.D. Wis. Apr. 22, 2011).

So too with Battles here. Again, there is no dispute that Battles is the sole owner of Aegis. The undisputed facts also demonstrate that Battles had operational control over the activities of Aegis. It therefore follows that Battles is jointly and severally liable with Aegis for any unpaid wages that are ultimately found to be due to Okoro. Thus, on the joint and several liability issue the plaintiff's motion for summary judgment will be granted.

In conclusion, and for all of the foregoing reasons, the plaintiff's motion for summary judgment will be granted.

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that a conference will be conducted on May 10, 2012 at 9:00 a.m. in Room 242, 517 E. Wisconsin Avenue, Milwaukee, WI 53202, for the purpose of discussing with the parties the further steps that need to be taken in order to bring this action to final judgment.

**SO ORDERED** this 23rd day of April 2012 at Milwaukee, Wisconsin.

                                   **BY THE COURT**:

                                   s/ William E. Callahan, Jr.
                                   WILLIAM E. CALLAHAN, JR.
                                   United States Magistrate Judge