```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF WISCONSIN
---------------------------------------------------------------
 CATHERINE OKORO,                      )
                                       )
                        Plaintiff,     )   Case No. CV 11-267
                                       )   Milwaukee, Wisconsin
     vs.                               )
                                       )   September 25, 2012
 PYRAMID 4 AEGIS and JEROME BATTLES,   )   1:46 p.m.
                                       )
                        Defendants.    )

---------------------------------------------------------------
```

**TRANSCRIPT OF JURY TRIAL EXCERPT**
**TESTIMONY OF JEROME BATTLES**
BEFORE THE HONORABLE WILLIAM E. CALLAHAN, JR.
UNITED STATES MAGISTRATE JUDGE, and a jury.

APPEARANCES:

  For the Plaintiff:            Marni J Willenson
                                Willenson Law LLC
                                542 S Dearborn St - Ste 610
                                Chicago, IL 60605
                                312-546-4910
                                Fax: 312-261-9977
                                Email: Marni@willensonlaw.com

                                Rebecca L Salawdeh
                                Salawdeh Law Office LLC
                                7119 W North Ave
                                Wauwatosa, WI 53213
                                414-455-0117
                                Fax: 414-418-4517
                                Email: Rebecca@salawdehlaw.com

  For the Defendants:           Robert N Meyeroff
                                Robert N Meyeroff SC
                                633 W Wisconsin Ave - Ste 605
                                Milwaukee, WI 53203-1918
                                414-276-8404
                                Fax: 414-276-1130
                                Email: Rmeyeroff633@sbcglobal.net

  U.S. Official Reporter:       JOHN T. SCHINDHELM, RMR, CRR,
  Transcript Orders:            WWW.JOHNSCHINDHELM.COM

Proceedings recorded by computerized stenography,
transcript produced by computer aided transcription.



1

```
 1

 2                        I N D E X

 3     WITNESS    EXAMINATION                          PAGE

 4     JEROME BATTLES, DEFENSE WITNESS

 5          DIRECT EXAMINATION BY MR. MEYEROFF...............    3

 6          CROSS-EXAMINATION BY MS. WILLENSON..............   23

 7          REDIRECT EXAMINATION BY MR. MEYEROFF............   44

 8

 9                         *****

10                      E X H I B I T S

11     NUMBER              DESCRIPTION          OFFERED  ADMITTED

12       17     Paychecks statement regarding Keywana ..... 41    41

13              Battles

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **EXCERPT OF JURY TRIAL PROCEEDINGS**

2             **TESTIMONY OF JEROME BATTLES**

3                      *    *    *

4          THE COURT:  Okay.  Mr. Meyeroff?

01:46  5          MR. MEYEROFF:  Okay, I'll call Jerome Battles.

6       JEROME BATTLES, DEFENSE WITNESS, DULY SWORN

7          THE CLERK:  Thank you.  Please be seated.

8          Would you please state your name and spell it for the

9  record.

01:46  10         THE WITNESS:  Jerome Battles, J-E-R-O-M-E,

11  B-A-T-T-L-E-S.

12                  DIRECT EXAMINATION

13  BY MR. MEYEROFF:

14  Q.  Okay.  Mr. Battles, are you married?

01:46  15  A.  Yes.

16  Q.  Are you separated from your wife?

17  A.  Yes.

18  Q.  How many children do you have?

19  A.  Five.

01:47  20  Q.  And what -- what's your -- what do you do for a living?

21  A.  I work for AT&T U-verse.  Install and repairs.

22  Q.  And how long have you worked for AT&T?

23  A.  AT&T, about five years.

24  Q.  And before that?

01:47  25  A.  Time Warner Cable.

1  Q.  And how long did you work for them?

2  A.  Could have been about -- I worked at least about 14, 15

3  years, but I believe documentation shows about 12 years.

4  Q.  Now, where did you go to high school?

01:47  5  A.  Rufus King.

6  Q.  And what year did you graduate?

7  A.  '78.

8  Q.  And then did you have any further education?

9  A.  Yes.

01:47  10  Q.  Where?

11  A.  MATC.  Associate degree, police science.  Second associate

12  degree, private security.  Attend some courses at UWM-Milwaukee,

13  understudy criminal justice, two years.

14  Q.  And where do you live?

01:48  15  A.  8211 West Hope Avenue, Milwaukee, Wisconsin.

16  Q.  Do you own your own home?

17  A.  Yes.

18  Q.  And did you have a mortgage prior to going into this group

19  home business?

01:48  20  A.  I had my private mortgage.  And then I was doing

21  foreclosures.  I bought this house as a foreclosure, in cash,

22  and I pulled out a second mortgage later, on the house.

23  Q.  And what was the reason you put on a second mortgage?

24  A.  Yes.

01:48  25  Q.  What?

4

1  A.  Yes.  I put it on.  The reason why?

2  Q.  Yeah.

3  A.  I had the business from '07 and up to '09, and I spent

4  probably enough money -- or I was losing money, lost money.

01:49  5  Market went bad.

6  Q.  Wait just a minute.

7  A.  Yes.

8  Q.  Did you have to borrow money to buy the group home?

9  A.  I had to borrow money to run the group home.

01:49  10  Q.  Okay.  And how much did you borrow?

11  A.  55,000, against.

12  Q.  All right.  And when did you buy the group home?

13  A.  Foreclosure about -- I would say somewhere in about '06,

14  '07.

01:49  15  Q.  And then you got the group home licensed to operate?

16  A.  Yes.  Agent Wade -- I met Agent Wade about that time.  She

17  owned two group homes.  And we set up a group home.  She

18  encouraged me to set it up.  And her and I set that group home

19  up.  It's --

01:49  20  Q.  All right, just wait for a question.

21  A.  Yes.

22  Q.  Was she your administrator?

23  A.  From day one, yes.

24  Q.  And what other training did Adriane Wade have?

01:50  25  A.  The state required you to have quite an amount of

5

1    experience.  Education was in social work or -- you have to send

2    that document to the state.

3    Q.  Was Adriane Wade a registered nurse?

4    A.  She's a registered nurse.  And she has I believe a masters

01:50    5    in administration or in the field.

6    Q.  And she helped you set up and get the group home certified;

7    is that right?

8    A.  Yes.  Based on her structure.  It's named after her

9    business.

01:50    10    Q.  All right.  Where did you get that name?  What's the name of

11    the group home?

12    A.  Name of the group home is Pyramid 4 Aegis.

13    Q.  What does that mean?

14    A.  Just a Pyramid.  Got it from her.  Her group home is Pyramid

01:51    15    Group Homes, mine is 4 Aegis.

16    Q.  Now, during the time -- so do you still own the group home?

17    A.  Yes.  It's in -- license has been revoked.

18    Q.  License has been revoked?

19    A.  It's in process because of management.

01:51    20    Q.  Because of what?

21    A.  Management.

22    Q.  Do you have any clients now?

23    A.  No.  Haven't for over almost two years.

24    Q.  Now, during the time that you were operating the group home

01:51    25    did you ever pay yourself back any of the money you loaned to

6

1     the group home?

2     A.  We increased three clients and I was taking my work money

3     and putting it into the business.  And I had taken -- not taken,

4     but I put down like $500 every two weeks to pay myself back the

5     money that I put in from my job to pay my mortgage and the

6     second mortgage.

7     Q.  Now, when did you meet Ms. Okoro?

8     A.  I believe I met her -- I believe that was about '09.  She

9     came to my building.

10    Q.  And so she came right to the group home?

11    A.  Yes.

12    Q.  And why did she come there?

13    A.  Well, don't know how she got my name.  But she came there,

14    we sat and talked, and she took information.  And she liked the

15    information she received and asked for a relationship formal

16    first.

17    Q.  Did she talk about insurance?

18    A.  Yes.  She sold me a home policy, vehicle, and a policy

19    that -- $5,000 policy which is -- I hear it's much less than

20    that.  So I don't know what happened with that.  But --

21    Q.  Was that a liability policy?

22    A.  That was a million-dollar policy for the group home.

23    Q.  And how much did you pay her for that?

24    A.  That was -- first payment was $2500, and then I have to pay

25    a second payment thereafter.

7

1   Q.  And then what, she asked if you wanted to date her?

2   A.  Date.  And then she solicited as other agents does, numbers

3   of my friends.  And she called a number of those friends for

4   business.

5   Q.  All right.

6   A.  She asked me to date her.  Quite honestly, I thought was

7   strange.

8   Q.  Did she ask to become involved in your group home business?

9   A.  She said she wanted to learn the group home.  And we got to

10  talking.  And she understood that I had some issues and problems

11  with an agent that wasn't caring much for the business.  She

12  said I'll help you to volunteer --

13  Q.  Could you speak louder, please?

14  A.  I'm sorry.  My voice is a little low anyway.

15          She offered to -- she said that she got a business,

16  she got her own money, and she also owned property in Africa.

17  And she wanted to help me.  And she wanted to learn the

18  business.

19  Q.  Did she ever ask you to pay her?

20          MS. WILLENSON:  Judge, could we get a foundation for

21  this?

22          THE COURT:  Are you going to be conducting the

23  examination?

24          MS. WILLENSON:  Of Mr. Battles, yes.

25          THE COURT:  Okay.  Overruled.  Go ahead.  Ask your

8

1    question.

2    BY MR. MEYEROFF:

3    Q.   Yeah.  Did she ever ask you to pay her?

4    A.   No.  We never discussed money.  It was to start off a

01:55   5    relationship.  It was all about a relationship and going out

6    door to door.  It wasn't about money.  Didn't have any client.

7    It was about her learning the business.  Much information I got

8    from Adriane, learned from Adriane.  I was to teach her and

9    involve her with the other people that's involved.

01:55  10    Q.   And you said that you didn't have any clients; why did you

11    talk about that?

12    A.   I said I didn't have any client.  Getting clients, Adriane

13    and I, we did open house.  That's one of the reasons she got the

14    idea of the open house.  We did open house, we did grass root.

01:56  15            We did have one particular client, if I remember he

16    was an older gentleman.  He died some months after.  It was a

17    emergency situation.  Cathy doesn't know anything about that.

18    Q.   Let me stop you there.  You talked about not being able to

19    pay Catherine and then why couldn't you pay her?

01:56  20    A.   Catherine came on board -- Catherine and I was together.

21    From day one I was in debt.  I was in debt, didn't have money.

22    We were running in the negative.  No client.

23    Q.   Okay.  Did Catherine ever talk to you about where her kids

24    went to school?

01:57  25    A.   Of course.  I mean, I've been an athlete, you know, in

9

1    college and high school, and I was interested.  I took state in

2    track.  Played basketball.

3    Q.  Did her kids go to Messmer?

4    A.  Yes.

5    Q.  How did that enter into the relationship you had in her

6    working at your place?

7    A.  Well, because I was an athlete I spent time mentoring her

8    kids.  Went to the game, coached the game, played the game,

9    college, high school.  And we spent time together.  Her kids was

10    a few blocks away.  She stopped by the building.  We often

11    talked about her kids and sports and what I've done in the city

12    of Milwaukee.  I went to a few games.  Went to her house.

13    Couple parks.  We had done parks.

14    Q.  Let me stop you there.  Did you ever go to see Ms. Okoro's

15    daughter play sports?

16    A.  Sure.

17    Q.  How many times?

18    A.  I met the coach, at least twice.  I met the coach, talked to

19    the coach.  Went to her practice, went to her game.  Gave her

20    tips.

21    Q.  All right.  And what -- about what time of day was that?

22    A.  I think that JV starts early.  They started for varsity so

23    varsity, I believe about 7:00 they start.  JV's early, it's

24    maybe like 5:00 or 5:30.

25    Q.  Was her daughter on JV?

10

1    A.  Yeah, she wasn't on varsity at the time.

2            THE COURT:  What sport are we talking about?

3            THE WITNESS:  Basketball.

4    BY MR. MEYEROFF:

01:58   5    Q.  Basketball?

6    A.  Yeah.

7    Q.  And what months would that have been?

8    A.  Wow, basketball starts -- you gotta think about around

9    November.  Around November and December.  You had practice,

01:58   10   games.  I think games start in December.

11           MS. WILLENSON:  Your Honor, the witness is

12   speculating, not testifying from his memory.

13           THE WITNESS:  I played basketball.  I'm not

14   speculating.

01:58   15           THE COURT:  All right.  Stop.  Ask another question.

16   BY MR. MEYEROFF:

17   Q.  Okay.  So you said that -- how many times did you pick up

18   the daughter or pick up Ms. Okoro to take her to the see the

19   daughter play basketball?

01:59   20   A.  Not to even mention --

21   Q.  Just answer the question.

22   A.  You asked me how many times.  I picked up her daughter from

23   school once before.

24   Q.  What?

01:59   25   A.  I also picked her daughter up from school.  I've done that

11

1    too at the practice.

2         THE COURT:  Okay.  This is not uncommon that everybody

3    wants to kind of tell their story, but we have to do it in an

4    organized fashion.  So I'm going to remind you to answer the

01:59    5    question that's asked.  And I think the question was how many

6    times -- what was the question --

7    BY MR. MEYEROFF:

8    Q.  How many times did you pick -- or did you take Miss Okoro

9    from work to see her daughter play basketball?

01:59   10    A.  Probably twice.

11    Q.  All right.  And did you ever -- did Ms. Okoro's daughter

12    play any other sport?

13    A.  She was running track.

14    Q.  Did you ever go to see a track meet with Ms. Okoro?

02:00   15    A.  I don't think I made the track meet, no.

16    Q.  Now, you've heard the testimony about this Exhibit 2 which

17    are these timesheets; did you hear that testimony?

18    A.  I heard the testimony.

19    Q.  Did you ever see a timesheet that Ms. Okoro filled out?

02:00   20    A.  Never.

21    Q.  During the time that Ms. Okoro worked there did she ever ask

22    you for money?

23    A.  No.

24    Q.  Even before she left like in May of 2010, did she tell you

02:01   25    she was leaving because she wasn't being paid?

12

1  A.  There was other issues.  No.

2  Q.  Did she ever tell you why she was leaving?

3  A.  It wasn't because of money.

4  Q.  What did she tell you?

02:01  5  A.  It was because of other female's jealousies.  I offered

6  her --

7  Q.  Just a minute.

8  A.  I'm sorry.

9        MS. WILLENSON:  Move to strike that.

02:01  10        THE COURT:  Well, I assume -- well, why don't you -- I

11  think it's important that we find out the basis of his remarks

12  right there.  I don't know what the basis is.  There's a lack of

13  foundation.

14  BY MR. MEYEROFF:

02:01  15  Q.  Mr. Battles, I'll ask you what did Miss Okoro tell you was

16  the reason that she left?

17  A.  Her reason was because, more like female issues.

18        THE COURT:  She says I'm leaving because of female

19  issues?  What did she tell you is the reason why she was

02:02  20  leaving?

21        THE WITNESS:  No.  It was female issues.  And then

22  also, I said -- do you want me to explain?  I can explain.

23        THE COURT:  I think the question is what did she tell

24  you as to why she was leaving?  That's the question.

02:02  25        THE WITNESS:  Okay.  She never told me she was

13

 1    leaving.  I had a conference with her and she walked out.  And,

 2    you know, it's -- she was helping me.  She had a conference with

 3    me, she said, "I'm walking out."

 4    BY MR. MEYEROFF:

 5    Q.  And did she say why?

 6    A.  I can explain if you want me to.

 7        THE COURT:  Well, the question is did you ask her why

 8    she was leaving, why she walked out?

 9        THE WITNESS:  We were having a conversation.  She was

10    being argumental.  And she walked off.  Just walked.

11    BY MR. MEYEROFF:

12    Q.  So is it correct to say she never told you why she was

13    leaving?

14    A.  No.  We didn't have -- it wasn't that.  It was more just the

15    jealousy.

16    Q.  Did she ever -- all right.  Okay.  What leads you to suspect

17    that it was because of jealousy?

18    A.  Well, her and I stopped talking and dealing with each other

19    I would say during November.  And there was another young lady

20    that I was seeing, she knows that.  And also that was during the

21    time that she was rejected that I sent information for the

22    administrator.

23    Q.  When you say she was rejected, as an administrator?

24    A.  Yes.

25    Q.  And who rejected her?

14

1  A.  Caroline Happel.  She's one of the administrators for the

2  state, quality assurance, submitting the information,

3  documentation to care for the client, rejected her.

4  Q.  And that happened in November of 2009?

02:04  5  A.  In around about that time.

6  Q.  But Miss Okoro continued to show up at your group home; is

7  that right?

8  A.  Yeah.

9  Q.  All right.

02:04  10  A.  Yeah, whatever.

11  Q.  And what duties did she have there, if any?

12  A.  We wasn't looking at it as duties.  I know we keep saying

13  work, but her premises was I want to help you.  She was the one

14  that says help.

02:05  15  Q.  All right.  Let me stop you there.  Did she have any set

16  hours?

17  A.  No.  We never did.  I have a lockbox on that door.  And the

18  premises is that my caregivers, they pick up the key, they go in

19  the facility, and they attend their responsibilities.

02:05  20  Q.  Did Miss Okoro ever tell you how many hours she was working?

21  A.  No.  Sometime we would meet.  No, she didn't tell me.  She

22  wouldn't talk about that.

23  Q.  Did you ever promise to pay her $2,000 a month?

24  A.  No.  I don't have money to give.

02:05  25  Q.  Was -- now, you say she was not an administrator, was she a

15

1    caregiver?

2    A.  She wasn't a caregiver, she was an administrator.

3    Q.  All right.

4    A.  She was my girlfriend at the time.

5    Q.  Did she have an employment contract?

6    A.  Never.

7    Q.  Did she have a personnel file?

8    A.  If she did she hid it, she had it at home.

9    Q.  Now, I'm going to show you some documents here.  I'm going

10   to show you what's been marked as Exhibit 6 and ask if you can

11   recognize this.

12   A.  I do.

13   Q.  What is it?

14   A.  It's a pamphlet that Adriane and I put together and it's

15   been blacked out by a jealous woman with Adriane's name and

16   phone number on it.

17   Q.  Whose name is blacked out on it?

18   A.  Adriane Wade.  That's second in command above me.

19   Q.  And where did the wording come from on the first and second

20   page of Exhibit 6?

21   A.  The wording?  These are statements from Adriane to file that

22   she copied all of her information from her facility and brought

23   it over to my building.  And we just -- there's a copy of that.

24   Q.  Now, Ms. Okoro, one of her exhibits is a letter she sent out

25   to caregivers; do you recall that?

16

1    THE COURT:  What exhibit are you talking about?

2    MR. MEYEROFF:  I'm just looking for it.

3 BY MS. SALAWDEH:

4 Q.  Now, these Exhibit 12 are two letters of discipline.  Have

5 you ever seen these before?

6 A.  Never seen them.  Never signed them.  Never seen it.

7 Q.  Were you aware of some problem that Ms. Okoro caused with

8 the employees?

9 A.  There was one particular problem that I had to talk to

10 Ms. Okoro about in handling my workers.  She was being very

11 rude.

12 Q.  Speak up.

13 A.  I'm sorry.  She was being very forceful and rude using some

14 hard manners in front of her kids at the group home and I had to

15 talk with her.

16 Q.  Were there any complaints from your employees?

17 A.  There were complaints.

18 Q.  Now, Ms. Okoro has introduced testimony indicating that she

19 contacted doctors on behalf of the clients; did you hear that

20 testimony?

21 A.  I did.

22 Q.  Was that -- was she authorized to do things like that?

23 A.  No, she didn't have to.

24 Q.  Whose job is it to contact the doctors?

25 A.  Adriane Wade.

17

1  Q.  Now, about how many times a week did you go to the group

2  home?

3  A.  I would say maybe out of seven days, maybe three to four

4  times a week.

5  Q.  And Miss Okoro worked mainly between Monday and Friday?

6  A.  You said work?  You said between Monday and Friday?

7  Q.  Yes.

8  A.  I don't know when she went to the building.

9  Q.  All right.

10  A.  She wouldn't tell me.  She would just go.

11  Q.  Let me ask you a better question.  How many times a week did

12  you go there between Monday and Friday?

13  A.  My shift varies.  Sometime I'm off in the week.  I'm off a

14  couple days of the week.  I'll go by a couple times in a week.

15            THE COURT:  You mean when you're off your other job?

16            THE WITNESS:  Yeah, AT&T.

17  BY MR. MEYEROFF:

18  Q.  So when you went there say during the week between Monday

19  and Friday, would Miss Okoro typically be there?

20  A.  No.

21  Q.  What time of day would you usually go?

22  A.  Usually in the beginning --

23  Q.  Just answer what time of day would you go?

24  A.  Would I go?

25  Q.  Yeah.

18

1  A.  I go various different times because of my building.  I go

2  during my route when I'm working for AT&T.  I'll go there during

3  lunch.  I go there after on my route back from the east side.

4  At night sometimes I'll go by.

02:12  5  Q.  When you say at night what time do you mean?

6  A.  A surprise visit sometimes 12:00, 11:00.  You know,

7  surprise.

8  Q.  Did you ever go there and take Miss Okoro out to dinner?

9  A.  Maybe three, four times a week.

02:12  10  Q.  So tell me typically what time you would show up and how

11  long you would stay and when you would leave and when you would

12  come back.

13  A.  Sometime off work Wednesday, Thursday, sometime Tuesday,

14  Wednesday.

02:12  15  Q.  What time?

16  A.  I would have all day.  Sometimes we'd do lunch.  We've done

17  lunch.  We've done Cracker Barrel in the morning.  You know,

18  it's different times of the day.

19  Q.  And you've looked at Exhibit 2 and some of the time you took

02:13  20  her out to lunch were times she claimed to be working?

21  A.  Appeared to be.

22  Q.  Now, did Miss Okoro at one point buy you a present

23  consisting of an African pants and a shirt?

24  A.  Yes.

02:13  25  Q.  And do you know when that was?

19

1  A.  That was I would say a few months after the relationship

2  began.

3  Q.  And the relationship began when?

4  A.  I would say around November, in that area.  November '09.

5  Q.  All right.  And was it -- was it a time that's covered by

6  Exhibit 2?

7  A.  What's your question?

8  Q.  You know, Exhibit 2 goes from May of 2009 -- wait -- June of

9  2009 to May of 2010.

10  A.  Okay.

11  Q.  And you said it happened in November of 2009, about.

12  A.  Well, I'm guessing.  I'm just -- I know shortly after --

13  May, June -- she -- I know within six months she went to Africa,

14  she was gone for a month.

15  Q.  How long was she gone for?

16  A.  It seemed -- I believe because she had some personal

17  business and it took her some time to do that, so it seemed to

18  me it was about a month.

19  Q.  I'm going to show you Exhibit 2.  And Exhibit 2 starts

20  6/7/09.  Do you see that?

21  A.  Right.

22  Q.  And it ends May 18th of 2010 on the last page.  Do you see

23  that?

24  A.  Uh-huh.

25  Q.  Okay.  And you said that the Africa trip was around November

02:14
02:15
02:15
02:15
02:15
02:15

1  of 2009?

2  A.  Well, correction -- let me correct you on that one.  I said

3  it was a few months after I met her.  A few months.  In November

4  is when we had our first client.  So I need to correct that.  A

5  few months after I dated her she took a trip to Africa.

6          THE COURT:  When did you start dating her?

7          THE WITNESS:  So that's where it's foggy there.  More

8  so there in that May time, in that area.  But I know it was a

9  few months after we were dating she went to Africa and brought

10  the shirt and pants back.

11  BY MR. MEYEROFF:

12  Q.  So you started dating her in May of 2009?

13  A.  Somewhere in there.

14  Q.  And to the best of your recollection the Africa trip was a

15  few months after.

16  A.  Yeah, few months after dating.

17  Q.  And was the trip over before you got your first client

18  there?

19  A.  I know the first client was in November.  I'm not sure.

20  It's more possible that it was because it was a few months after

21  dating and our first client was in November.

22  Q.  Was Miss Okoro a supervisor at your group home?

23  A.  She couldn't.  She needed to learn the business.  She didn't

24  have the knowledge.

25  Q.  Do you see the timesheet that calls for the signature of a

1    supervisor?

2    A.   I saw something for supervisor, yes.

3    Q.   And do you know whose signature that is?

4    A.   I can't read that, it's a scribble.

5    Q.   All right.

6    A.   Looks like Catherine something.

7    Q.   Did you ever come to the group home when Ms. Okoro was there

8    and take her to the park?

9    A.   Of course.  We played basketball.  I took the kids to the

10   park, took her to the park, and we played basketball.  Some

11   kids -- one of the kids went over to play volleyball in the

12   sand.

13   Q.   About what time of day was that?

14   A.   Talking, I remember we started --

15   Q.   Just give me the time.

16   A.   Before dark because it got dark on us.  So it was about

17   probably -- I'm looking at about maybe 5:00, 6:00.

18   Q.   Did you ever observe Ms. Okoro doing insurance work at the

19   group home?

20   A.   Quite often.

21   Q.   What did you observe?

22   A.   Well, she took my names of my friends, she made phone calls.

23   She was in transition from a -- she was working for a firm, I

24   don't know if it was Farmers or whatever, but then she was

25   moving to her own office.  She didn't have an office, so she

1  would come and use my building.  And then she would call some

2  clients, make appointments or something like that.  Because she

3  went out on her own business.  She was afraid to go out in her

4  own business, I remember that.  She wasn't solid with the

02:20  5  building yet, her own business, before she pared up with another

6  guy.

7           MR. MEYEROFF:  I have no other questions.

8           THE COURT:  Cross-examination.

9                  CROSS-EXAMINATION

02:21  10  BY MS. WILLENSON:

11  Q.  Mr. Battles, how many hours do you think it would be

12  appropriate to deduct from the hours shown on the timesheet to

13  account for the trips to the park or the basketball games you've

14  described?  Would that be about 10 hours?

02:21  15  A.  Basketball court, if I were deducting any hours, social,

16  basketball, relationship, if she did any hours in helping a

17  week, I would say she may have came in probably three to four

18  times a week and she may have spent -- when she'd come there,

19  wait on her kids, maybe an hour.  Because we're trying to get in

02:22  20  and out because we want to get home.

21  Q.  Mr. Battles, that wasn't my question.

22  A.  I would say she'd spent an hour out of three times a week

23  visiting.

24  Q.  My question wasn't for you to guess based on speculation how

02:22  25  many hours you say Ms. Okoro was working.  My question was:  If

23

1  you were to deduct hours from the timesheets that you say you

2  spent with Ms. Okoro on trips to the park or basketball games,

3  how many hours should that be?

4       MR. MEYEROFF:  I'll object on the basis that it shows

02:22  5  that the timesheets have any legitimacy at all.

6       THE COURT:  Well, it's somewhat argumentative.  Why

7  don't you just ask him how many hours -- rather than framing it

8  in terms of how many hours would you deduct, how many hours did

9  they do that.

02:23  10  BY MS. WILLENSON:

11  Q.  How many hours did you spend at the park with Ms. Okoro or

12  at her kids' basketball games that overlap with hours that are

13  on the timesheet and, therefore, should be deducted from

14  whatever amount of hours the jury would recognize as hours

02:23  15  worked?

16  A.  Probably I spent about probably parts of games with them,

17  maybe 24 hours or so, maybe 30.

18  Q.  And on which week was that?

19  A.  Which week?

02:24  20  Q.  Yeah.

21  A.  We've done a lot of different things just on basketball and

22  parks.

23  Q.  How do we know --

24  A.  Excuse me?

02:24  25  Q.  You can finish your answer.

1   A.  We've done a lot of things other than basketball and park.

2   Q.  But I'm asking about those things because you specifically

3   mentioned those.  And you had suggested that those things were

4   done during periods of time that Ms. Okoro has recorded on these

5   timesheets, so those are the questions I'm asking about.

6   A.  Maybe 30.

7   Q.  24 to 30 hours.  And where should those deductions be taken?

8   A.  What do you mean?

9   Q.  From which week?

10  A.  I don't know.  I've never seen these timesheets.  I would

11  say 30 hours from what she's using as an exhibit.

12  Q.  And you have no idea that those 30 hours that you spent with

13  her at the park or at basketball games allegedly with her were

14  at the same time hours as recorded on the timesheets.

15  A.  We never looked at that as hours of work.  So 30 hours do

16  you want to say parks and games.

17  Q.  But my question is, you don't know whether those were

18  Ms. Okoro's work hours recorded on Exhibit 2.

19  A.  I do know.  If she's saying that these JV games are in the

20  middle of the week, and I'm off on Wednesday and Thursday, and

21  Tuesday and Wednesday and she says she's there at 8:00 o'clock,

22  you know, that's some of the time.  So I never sat down and

23  count it up, but that's during the time she said she worked.

24  Q.  All right.  And the reason you didn't count it up is because

25  you didn't keep any record yourself of the hours that Ms. Okoro

25

1    worked.

2    A.  We didn't have any agreement.

3    Q.  I'm asking you a yes-or-no question.  Is it the case that

4    you did not keep any record of Ms. Okoro's work hours?

5    A.  I had no knowledge we were keeping record of hours of any

6    work.

7    Q.  Did you keep any records, time records for her?

8    A.  I kept only my caregiver's hours and they got paid.

9    Q.  That's a no.  Isn't that a no?

10   A.  We didn't.  I didn't.

11   Q.  And did you direct anyone to create time records for

12   Ms. Okoro?

13   A.  We weren't supposed to.

14   Q.  Did you direct anyone to keep time records for her?

15   A.  No one.

16   Q.  You didn't direct anyone.

17   A.  We never had an agreement to.

18   Q.  You didn't keep records yourself and you didn't direct

19   anyone to keep them; is that correct?

20   A.  Yes.

21   Q.  Do you understand that under the Fair Labor Standards Act

22   employers are required to keep and maintain accurate records of

23   the hours worked by their employees?

24   A.  She wasn't working for me.

25   Q.  Can you answer -- please answer the question that I've

26

1   asked.  Do you understand that that's a requirement of the Fair

2   Labor Standards Act?

3   A.  I understand that as an employee.

4   Q.  In other words, you've been an employee and so you

5   understand that your employer should keep track of your hours?

6   A.  I can't walk on anybody's job without signing an agreement

7   and acknowledgement that I'm working the job.

8   Q.  So you understand that time records should be maintained for

9   employees.

10  A.  Of course.

11  Q.  And that should be done by their employees.

12  A.  If they're employees.

13  Q.  I understand.  And the responsibility for that lies upon the

14  employer, correct?

15  A.  We didn't have that agreement.

16        THE COURT:  Okay.  Let's not talk about Ms. Okoro.

17  The question is whether or not you know that an employer is

18  supposed to keep records of employees' time.

19        THE WITNESS:  Yes.

20        THE COURT:  Okay.  Next question.

21  BY MS. WILLENSON:

22  Q.  And you didn't do that for Ms. Okoro.

23  A.  No.

24  Q.  And that's because according to what you just said she

25  wasn't your employee.

1    A.   That was our agreement as a relationship, as friend and

2    help.

3    Q.   Do you understand the court has already made a decision --

4         THE COURT:  No, don't talk about me.  Let's talk about

5    his knowledge.

6    BY MS. WILLENSON:

7    Q.   Is it still your contention, sitting here right now, that

8    Ms. Okoro was not your employee?

9    A.   It's hard to fascinate that if we're talking about a

10   relationship and then she wanted to help me and never talk about

11   any money until there's some jealousies or some problems.

12   Q.   So you're still suggesting that she wasn't your employee,

13   sitting here --

14        MR. MEYEROFF:  Your Honor, could we have a side bar?

15        THE COURT:  No.  Next question.

16        MS. WILLENSON:  Is he directed to answer that

17   question?

18        THE COURT:  What's the question?

19        MS. WILLENSON:  Is he suggesting, sitting here today,

20   that she wasn't his employee.

21        THE COURT:  You didn't think she was your employee,

22   right?

23        THE WITNESS:  I didn't think she was.

24        THE COURT:  Okay, next question.

25   BY MS. WILLENSON:

28

1    Q.   When did you first buy insurance for Ms. Okoro -- from

2    Ms. Okoro?

3    A.   Shortly after meeting her.  Don't know the exact date.

4    Q.   Do you know what year that was?

5    A.   During the year of I believe '09.

6    Q.   Was it the winter of '09, the spring of '09?

7    A.   I believe it probably was spring.

8    Q.   Do you remember the month?

9    A.   No.

10   Q.   Did you yourself see Ms. Okoro use harsh manners or words

11   with anybody present at Pyramid 4 Aegis?

12   A.   With me.  And quite often I had to talk to her about that.

13   Q.   You had to talk to her about the fact that she used harsh

14   language with you?

15   A.   With me, because it's just her nature when she's -- she told

16   me it was a culture thing, but I had to talk to her about it.

17   Q.   Did you observe her use any harsh manners or words with any

18   other person?

19   A.   I have.

20   Q.   And --

21   A.   And she said that she has a loud tone, that's just the way

22   she are.

23   Q.   Who did you see her use harsh manners and words with?

24   A.   Young lady, what's her name, we call her -- not Tamika.  I

25   think her name is Tamika.

29

1    Q.   And was this an employee of your company?

2    A.   No.  No.

3    Q.   Who is Tamika?

4    A.   That was a client.

02:30    5    Q.   I see.  You said something about a lockbox?

6    A.   Yes.

7    Q.   And that employees could use that to get into the facility?

8    A.   Yes.

9    Q.   Who would be there if Ms. Okoro wasn't there to ensure that

02:31    10   they were doing what they were supposed to be doing?

11   A.   The caregivers are responsible to be on duty.  There's a

12   lockbox outside with a key there.  Caregivers don't have to open

13   the door.  They get paid to open the building and perform their

14   duties.

02:31    15   Q.   Who supervised them in Ms. Okoro's absence?

16   A.   They are paid to do their duties.  And they don't have to --

17   administrators, Adriane Wade, she can assist them, but they're

18   paid to because of their job description to administer, make

19   phone calls to doctors and the family members somewhat.  That's

02:31    20   their job.  They're there.

21        The caregiver is supposed to be there.  It's a

22   problem, you have two people there in the household managing.

23   So that's their responsibility.

24   Q.   And do you think it would be appropriate to leave the group

02:32    25   home with just the caregivers inside with no supervision?

1    A.  Of course.  My third shift sleeps overnight with the client

2    on third shift.  I've been in there overnight myself.

3    Q.  So is that your testimony that for the -- for all or a

4    portion of Ms. Okoro's employment the caregivers were

5    unsupervised?

6    A.  They don't need to be -- someone do not need to be on site

7    in any group home.  Any group home.

8    Q.  So is that a yes?

9    A.  What's your question?

10   Q.  Whether during either all or most of Ms. Okoro's employment

11   the caregivers, according to you, were unsupervised.

12   A.  No.  They had Adriane Wade there.  Which there's times where

13   there was some medical issues and they call Adriane Wade.  She

14   came down and -- but she's a nurse as well as an administrator

15   and can assist.

16   Q.  So your testimony is that during the entire time in

17   Ms. Okoro's employment Adriane Wade continued to work for you?

18   A.  Has been my administrator.

19   Q.  The entire time.

20   A.  Entire time up until the -- my daughter came on as

21   administrator on 5/1/2010.

22   Q.  Did you pay Ms. Wade as an administrator?

23   A.  No.

24              THE COURT:  We're going to take our midafternoon

25   recess.  Let's take about 15 minutes.  It's about 2:30 right now

31

1    according to the court clock.

2           Now, don't talk about the case.  Keep an open mind

3    until you've heard all the evidence and the arguments of counsel

4    and the instructions of the court.

5           All rise for the jury.

6           (Jury out at 2:34 p.m.)

7           (Recess taken at 2:35 p.m., until 2:52 p.m.)

8           THE COURT:  Before we bring the jury in, what I'd like

9    to do -- now, Mr. Battles is your only witness; is that correct,

10   Mr. Meyeroff?

11          MR. MEYEROFF:  Yes.

12          THE COURT:  Do you know if you're going to be calling

13   any rebuttal?  Or --

14          MS. WILLENSON:  No, we will not.

15          THE COURT:  What I thought I'd do is hear the

16   testimony of Mr. Battles and then we'll take a short recess, go

17   through the jury instructions.  And I don't know if you have any

18   objections or anything you want to add, but we should -- 'cause

19   I'd like to if possible instruct them and give the closing

20   argument today.  If they have to come back tomorrow to

21   deliberate that's a separate question, but I'd like to

22   accomplish that if we could.  Is that okay with everybody?

23          MR. MEYEROFF:  Yes.

24          MS. SALAWDEH:  That would be great.

25          THE COURT:  So how do the instructions look?

1          MR. MEYEROFF:  Fine.  I have no objections.

2          MS. WILLENSON:  We have a couple.  Do you want to --

3          THE COURT:  Sure.  No, let's talk real quickly here.

4          MS. WILLENSON:  Okay.  On I think I'm looking at the

5     newest one, on page 2, at the bottom of page 2, there's the

6     second part of a reference --

7          THE COURT:  Sit down, please.

8          MS. WILLENSON:  We don't have any objection to the

9     second-to-last paragraph which includes corporations as persons

10    and so on.

11         THE COURT:  Right.

12         MS. WILLENSON:  But that last paragraph I think is

13    very confusing because there's no issue here about vicarious

14    liability.  I mean, you've already decided it's a joint employer

15    situation.  And I think this -- I understand it's standard

16    language, but in context this is quite confusing because we're

17    going to have an instruction under the Fair Labor Standards Act

18    that work that Ms. Okoro performed that was permitted.

19         THE COURT:  Okay.

20         MS. WILLENSON:  Would be compensable.

21         THE COURT:  So you want that paragraph out.

22         MS. WILLENSON:  Yeah.

23         MR. MEYEROFF:  Your Honor, let me just read it again.

24         (Brief pause.)

25         THE COURT:  I hear what you're saying.  It makes an

33

1    issue out of something that's not really an issue.

2            MS. WILLENSON:  Exactly.

3            THE COURT:  All right, we'll take that photograph out.

4    Anything else?

5            MS. WILLENSON:  The only other concern I had was given

6    the way some of the testimony has come in I think we would like

7    to see part of an instruction that we had proposed that deals

8    with this issue of what's called continuous workday.  And what

9    we had suggested, some of the language we had suggested is:

10           "For work done in a single workday an employee has the

11   right to be paid continuously from the time she starts her

12   principal work activities until she completes work on the same

13   day except for meal periods, regardless of how long those

14   activities take to perform or whether productive work is being

15   performed the entire time."

16           And this might need to be modified just in light of

17   the particular schedule that she had after the clients came into

18   the facility where she was --

19           THE COURT:  But she's testified she was there all the

20   time when she says she was there.  She was working the whole

21   time during the hours that she's got on the timesheets.

22           MS. WILLENSON:  But what Mr. Battles has suggested is

23   that for some of that time she may have been engaged in taking a

24   phone call for her insurance business, or dropping her child

25   off, or waiting for him, or socializing with him.  And the point

34

1   is that even if there was some unproductive time, under the

2   continuous workday rule she would be compensated for that time.

3           An employee's shift or as the regular pattern of

4   working from 8:00 to 1:00 and during that period they take a

5   phone call for another purpose or a personal call or a

6   discussion at the water cooler, that's still time that has to be

7   compensated.

8           MR. MEYEROFF:  Your Honor, I think that's taken care

9   of on page 9 where it determines what is an hour worked and it

10  says something done primarily for the benefit of the employer.

11  And then it says:  "Furthermore, work not requested but

12  permitted to be performed is work time that must be paid for by

13  the employer."

14          So I think she should get paid for every hour that she

15  was working for the benefit of the employer and nothing more.

16  If she took off an hour to do insurance work she shouldn't be

17  paid for that.

18          MS. WILLENSON:  But that's actually not what the law

19  is and that's the issue.  And that's what I would assume that

20  Mr. Meyeroff intends to offer.  The law is the continuous

21  workday rule.

22          THE COURT:  Doesn't that apply where there is a

23  continuous eight-hour work day?  That's not what we have here.

24          MS. WILLENSON:  It is.  She had a regular schedule.

25  They can deny it.

35

1    MR. MEYEROFF:  Well, I think that this rule you're

2    citing contradicts what's in the instruction as to what an hour

3    of work is.  If an hour of work has to be done for the purpose

4    of the employer how can you pay her for the next hour of work

02:57    5    that isn't done for the purpose of the employer?

6    MS. WILLENSON:  If she starts work at 8:00 and works

7    until 10:00 and then leaves, she doesn't need to be paid until

8    1:00 o'clock.  If she's engaged in work activities between the

9    hours of 8:00 and 1:00 o'clock and she takes a phone call at

02:58    10    11:15 for 15 minutes, she still gets paid for the 15 minutes.

11    MR. MEYEROFF:  Yeah, it says that an hour is work

12    pursued necessarily and primarily for the benefit of the

13    employer.

14    You could argue that, you know, it's just an

02:58    15    insignificant interruption which shouldn't decrease her pay.

16    But I don't think you can tell them that they have to pay her

17    for the 15, 20 or 50 minutes that she's on the phone working for

18    her insurance business.

19    THE COURT:  What else do you have?

02:58    20    MS. WILLENSON:  That's the issue.  And what this

21    instruction addresses is the definition of employment, the

22    definition of work under the Fair Labor Standards Act.

23    The other issue is this continuous workday rule which

24    describes how time is counted for an employee who is on the

02:59    25    premises or engaged in work activities from X hour to X hour.

36

1     You actually can tell the jury that if she takes an insurance

2     call for some unspecified undocumented amount of time that they

3     don't need to guess about those hours because those hours would

4     be compensable anyway.

02:59   5         MR. MEYEROFF:  What if she took an insurance call for

6     four hours?

7         MS. WILLENSON:  Well, there's no evidence of that

8     here.  So I don't know how to deal with that hypothetical.

9         THE COURT:  All right.

03:00   10         MS. WILLENSON:  That was the beginning of number 15

11     and what we propose.  It's part of the first paragraph.

12         THE COURT:  Okay.  Liz, would you go take a look?

13         Anything else?

14         MS. WILLENSON:  No.

03:00   15         THE COURT:  Anything else, Mr. Meyeroff?

16         MR. MEYEROFF:  No.

17         THE COURT:  All right.  Then Mr. Battles, come on up.

18         MS. SALAWDEH:  Judge?

19         THE COURT:  Yes.

03:00   20         MS. SALAWDEH:  This might be me being hypersensitive,

21     but in his testimony he did use the name of one of the clients

22     at the group home.  Because if this is a record I'm wondering if

23     there is a way to just have that woman's name stricken.

24         (Discussion off the record.)

03:01   25         THE COURT:  All right.  Should we get the jury?

1    (Jury in at 3:02 p.m.)

2    THE BAILIFF:  You may be seated.

3    THE COURT:  You may proceed, Counsel.

4  BY MS. WILLENSON:

03:02  5  Q.  Mr. Battles, I believe you testified earlier that after the

6  first client came into the facility you began to pay yourself

7  back and that you paid yourself back in the amount of $500 a

8  week.

9  A.  I said that when I reached the third client then there was

03:03  10  -- I believe I collected $500 every two weeks for the mortgage.

11  And that was probably for about maybe two months.  The third

12  client.

13  Q.  The third client and now your testimony is that it wasn't

14  $500 a week, it was $500 every two weeks?

03:03  15  A.  Two weeks.

16  Q.  And that was so that you could recover back some of your

17  investment in the business.

18  A.  That's all.

19  Q.  So there was some money available to pay yourself back.

03:03  20  A.  Pay the business back, the mortgage, and my mortgage on the

21  third client as I believe that was April.

22  Q.  You're the signatory on the mortgage, right?  It's your

23  mortgage.

24  A.  Yes.  And the business.

03:04  25  Q.  After Ms. Okoro's employment ended you hired your daughter

1   Keywana (Phonetic) Battles; is that correct?

2   A.   My daughter was approved by the state and then hired as the

3   administrator.

4   Q.   You did hire her as the administrator.

5   A.   She was approved to be hired by myself and the state.

6   Q.   And this was after Ms. Okoro left her employment.

7   A.   No, that's not true.  That was before.  She came in -- Okoro

8   and I and my daughter, they was having a conversation, I

9   remember that.  It was -- she was hired probably as

10  administrator about maybe a month before she left, a few weeks

11  before she left.

12  Q.   When you say she, you mean Ms. Okoro.

13  A.   Okoro.

14  Q.   So a month or a few weeks before Ms. Okoro left you hired

15  your daughter Keywana Battles as the administrator.

16  A.   Yes.

17  Q.   And you paid her to do that job.

18  A.   Well, we had the clients at the time to get paid.

19  Q.   You paid her.

20  A.   Yes.  The administrator ran the business.

21  Q.   Now, when you were paying your daughter Keywana to perform

22  the job of administrator, did your company continue to use

23  Paychex to do your payroll?

24  A.   Always.

25  Q.   And when Paychex generated pay information for your

39

1    employees did you keep a record of that?

2    A.   Yes.

3    Q.   Mr. Battles, I'm going to show you what we've marked as

4    Exhibit Number 17.   This is a document that you've seen before

5    that was at your deposition in Ms. Salawdeh's office in January

6    earlier this year.   Do you recall seeing this document?

7    A.   I've seen this document.   With Keywana Battles on it?

8    Q.   Correct.   Now, according to this document in the two-week

9    pay period May 16th, 2010 to May 29th, 2010, you paid your

10   daughter gross wages of $1,000.   Do you agree that this is what

11   the document shows?

12   A.   I don't have my glasses with me.

13            MR. MEYEROFF:   Are they here?

14            THE COURT:   Do you want to borrow mine?   Really?

15            THE WITNESS:   They're reading glasses.

16            THE COURT:   Yup.   That's what they are.   Go ahead.

17   Now I can't see.

18            (General laughter.)

19            THE WITNESS:   What was your question?

20   BY MS. WILLENSON:

21   Q.   The question is whether you agree that the document shows

22   that during the pay period May 16th to May 29th, 2010 you paid

23   your daughter gross wages of $1,000?

24            THE COURT:   Just one moment, please.

25            (Discussion off the record.)

1       THE WITNESS:  Yes.

2       (Record read.)

3       THE WITNESS:  Yes.

4       MS. WILLENSON:  Your Honor, we would move for the

5   admission of Exhibit Number 17.

6       MR. MEYEROFF:  No objection.

7       THE COURT:  Received.

8       (Exhibit 17 received in evidence.)

9   BY MS. WILLENSON:

10  Q.  Now, I know you said when Mr. Meyeroff was asking you some

11  questions that you characterized the work that Ms. Okoro did for

12  you is the work that at the facility is -- let me rephrase that.

13      What you said sounded like the job that you thought

14  you considered her to be in was the job of girlfriend.  Do you

15  recall that?

16  A.  Well, I didn't say that it was considered as girlfriend.

17  She didn't have a title.  She would come by maybe once or twice

18  a week if she needed to check in and check paperwork, anything

19  like that.  My administrator -- but she's not an administrator,

20  that was something that she was doing.  But she didn't even need

21  to be on the premises.  Not even a supervisor, not even a

22  administrator, not even I.  She doesn't need to be there.  Not

23  in the group home structure.

24  Q.  Isn't it the case that you didn't actually know when or how

25  often she came to work?

41

1    A.  Because she didn't have to be there.  And I did know she

2    made her own hours.  She did what she wanted to do because of

3    the relationship.

4    Q.  So you didn't know when she was there.

03:09  5    A.  There was no schedule.  She had no schedule to work.  She

6    made her own hours.

7    Q.  So you did not know when she was there.

8    A.  No.

9    Q.  And you did not know how often she was there.

03:10  10   A.  Wasn't scheduled, no.

11   Q.  Despite the fact that according to you she had no job title,

12   I believe you agree that there were a number of tasks that she

13   performed that were for the benefit of Pyramid 4 Aegis; is that

14   true?

03:10  15   A.  Tasks for her learning the business?

16   Q.  No.  I'm talking about tasks that were for the benefit of

17   the business.

18   A.  I can say some of the tasks, yes.

19   Q.  And one was she contacted people to invite them to an open

03:10  20   house in June 2009.  You agree that she did that, correct?

21   A.  She can do that.

22   Q.  But you know that that's something that she did.

23   A.  Some things that she did.  I wasn't there when she made

24   contact.  But I believe she did.

03:10  25   Q.  So you're acknowledging that she did do that.

42

1   A.  I'm just trusting what she says.  But if she did she can do

2   that at any time, 30 minutes a day, 15 minutes a day.  She

3   didn't need to be there eight hours.

4   Q.  All right.  Do you acknowledge that during her employment

03:11   5   she spoke to the caregivers and checked on them?

6   A.  Well, she can do that maybe an hour twice a week or so.

7   Doesn't have to be eight hours.  I believe she did, yes.

8   Q.  And she met with the caregivers?

9   A.  Yes.

03:11   10   Q.  And she checked to see if various files were properly

11   maintained?

12   A.  I don't know that.  And I suspect that if she's there that

13   would be a nice thing for her to do, to check, but it doesn't

14   take eight hours or six hours.

03:11   15   Q.  But you're not denying that she did that, are you?

16   A.  That she came in there?  I don't know what she did.  I hope

17   that she may have done that.

18   Q.  I see.  And do you agree that she collected timesheets from

19   a file and called in the hours to Paychex so that payroll for

03:12   20   your employees could be processed?

21   A.  We both called in Paychex.  If she felt she should have got

22   paid she would have called.

23   Q.  All right.  So she did some of that calling.

24   A.  We both called.

03:12   25   Q.  And she made phone calls to caseworkers to discuss clients.

43

1    A.  She says she did.  I didn't witness see her doing that.

2    Q.  Are you denying that she did that?

3    A.  I didn't see her do it.  She said she did it.  I took her

4    word for it that she did it.

03:12   5    Q.  So you're not disputing it.

6    A.  I'm not disputing it.

7    Q.  And she went to visit nursing homes?

8    A.  We had done that together in the beginning of our

9    relationship.  That was where our bond came.

03:12   10   Q.  And she talked to referral agencies to attempt to secure

11   clients for your business Pyramid 4 Aegis.

12   A.  We had done that together.

13   Q.  So she did that.

14   A.  We done that together.  When she was with me we went to the

03:13   15   referrals, myself, her and I.

16           MS. WILLENSON:  That's all I have.

17           THE COURT:  Any redirect?

18           MR. MEYEROFF:  Yeah, just a couple questions.

19                   REDIRECT EXAMINATION

03:13   20   BY MR. MEYEROFF:

21   Q.  Why did you pay your daughter and not pay Miss Okoro?

22   A.  Well, my daughter was registered with the state and I had

23   the money.  There was three clients I believe I had.  And my

24   daughter was there to clean up what was out of place.

03:13   25   Q.  Your daughter was registered with the state as what?

1    A.   Well, she has a master's degree in business and she also

2    managed other group homes.

3    Q.   Was she an administrator?

4    A.   Yes.

03:13    5    Q.   Was Miss Okoro an administrator?

6    A.   Never.

7            MR. MEYEROFF:  I have no other questions.

8            THE COURT:  Thank you, Mr. Battles.  You may step

9    down.

03:14    10           (Witness excused at 3:14 p.m.)

11                          *     *     *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

C E R T I F I C A T E


        I, JOHN T. SCHINDHELM, RMR, CRR, Official Court

Reporter for the United States District Court for the Eastern

District of Wisconsin, do hereby certify that the foregoing

pages are a true and accurate transcription of my original

machine shorthand notes taken in the aforementioned matter to

the best of my skill and ability.


Signed and Certified April 23, 2015.

/s/John T. Schindhelm

John T. Schindhelm


                    John T. Schindhelm, RPR, RMR, CRR
                    United States Official Reporter
                    517 E Wisconsin Ave., Rm 236,
                        Milwaukee, WI 53202
                    Website: WWW.JOHNSCHINDHELM.COM

